Dorothy A. **WILSON** and Louie P. Wilson, Plaintiffs–Appellants,

v.

**AMERICAN TRANS AIR, INC.,** Defendant–Appellee.

No. 88–1927.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1988.

Decided April 20, 1989.

Alfred H. Kreckman, Jr., Massey Anderson & Gibson, Paris, Ill., for plaintiffs-appellants.

Peter G. Tamulonis, Kightlinger & Gray, Indianapolis, Ind., for defendant-appellee.

Before POSNER, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Dorothy and Louie Wilson instituted this diversity action against American Trans Air, Inc., Holiday Inns, Inc., and Humphreys (Cayman) Ltd. in order to recover damages for injuries Mrs. Wilson suffered as a result of a criminal assault that occurred while the Wilsons were vacationing in the Cayman Islands. They were participants in a tour planned by American Trans Air, and the assault occurred while they were guests at a Holiday Inn on Grand Cayman Island operated by Humphreys. The district court granted American Trans Air's summary judgment motion, denied the Wilsons' motion to amend their complaint, and dismissed with prejudice their complaint against American Trans Air. On April 6, 1988, final judgment in favor of American Trans Air was entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. This appeal followed. We affirm the judgment of the district court.

## I.

### Background

American Trans Air (American) is a charter tour operator headquartered in Indianapolis, Indiana. It regularly plans and operates tours to the Cayman Islands. Participants in these tours are offered accommodations at the Holiday Inn Grand Cayman International Beach Resort (Holiday Inn Grand Cayman), operated by Humphreys (Cayman) Ltd. under a franchise agreement with Holiday Inns, Inc. American sometimes sponsors two or three trips to the Cayman Islands per month and has included, as an option, accommodations at the Humphreys hotel in its tours since at least 1976. One employee of American always accompanies the tours to the Caymans and stays with the tour group at the Humphreys hotel.

Mr. and Mrs. Wilson participated in an American tour to the Cayman Islands in October 1984. They chose to stay at the Humphreys hotel. On October 30, Mrs. Wilson was assaulted by an intruder entering her second floor hotel room through a balcony door while she was asleep. The intruder attempted to rob and rape Mrs. Wilson, and she suffered bodily injuries during the attack.

The majority of participants in these tours apparently do not choose to purchase an optional "ground package" that includes accommodations at a local hotel (in this case, Humphreys). However, promotional materials for this trip did include references to accommodations at the Holiday Inn Grand Cayman. In addition, brochures, rate cards, and other promotional material are provided to American by Humphreys at American's request. The Wilsons also assert that, since 1978, American has published advertisements for 131 tours specifically offering accommodations at the Humphreys hotel.

American did conduct basic research regarding its tours. It attempted to gain information about the political stability and climate of the destination country. It apparently did not inquire into guest safety and security at the hotel. The Wilsons allege that there was substantial criminal

activity involving guests at the Humphreys hotel in the months preceding the attack on Mrs. Wilson, *see* Appellants' Br. at 10, but American disclaims any knowledge of such activity.

## II.

### Discussion

The Wilsons maintain that American is liable to them because it breached its duty as a charter tour operator to investigate proposed accommodations for safety and to warn prospective patrons of any dangerous conditions discovered during the investigation. The Wilsons submit that this duty arises out of contractual language contained in American's travel brochure, the federal regulations governing charter tour operators, and tort law. The contract allegedly gives American, as a charter tour operator, the duties of an innkeeper, while the Wilsons contend that principles of Indiana tort law require American to conduct a reasonable investigation into facilities and warn of any dangerous conditions that could affect guests. The district court properly rejected these arguments and granted summary judgment to American.

The Wilsons also attempted to amend their complaint to include a count alleging that American and Humphreys were joint venturers with respect to the hotel accommodations offered to participants in American's tours to the Cayman Islands. The

district court denied the Wilsons' motion to amend, and we conclude that it did not abuse its discretion in doing so. We shall address each of the Wilsons' contentions in turn.[1]

### A. *Summary Judgment*

#### 1.

■ The Wilsons ground their contract argument in the following language found in the advertising newsletter that American distributed to potential customers:[2]

> Responsibility of American Trans Air: This tour program is planned and operated by American Trans Air, Inc. ... *as principal* and tour operator.... American Trans Air is responsible for making all arrangements for transportation, provided that *in the absence of negligence on the part of American Trans Air,* the responsibility does not extend to any assumption of liability for any personal injury or property damage arising out of or caused by any negligent act on the part of any hotel, other air carrier or anyone rendering any of the services or accommodations being offered in connection with this Public Charter.

Appellants' App. at 53 (emphasis supplied). Contract language like this is expressly authorized by 14 C.F.R. § 380.32(x) (1988), the federal regulation governing contracts between public charter operators and charter participants.[3]

---

1. In the proceedings before the district court, the parties raised a choice of law issue. The Wilsons maintained that the law of Indiana should govern the analysis of their claim, while American asserted that the law of the Cayman Islands should apply to at least a portion of the Wilsons' claims. In its appellate brief, however, American noted that, "because the Plaintiffs contend that their claims are governed by Indiana law, this Court may affirm the entry of summary judgment in favor of American without reaching the choice of law issue." Appellee's Br. at 9. In light of this concession, we conclude that there is no need for us to resolve the parties' dispute over the applicable law. For the purposes of reviewing the district court's disposition of American's summary judgment motion, we shall apply the law of Indiana—the substantive law advocated by the nonmoving party.

2. This information was contained in the newsletter of the AmbassadAir Travel Club, a wholly owned subsidiary of American Trans Air. AmbassadAir publishes a monthly newsletter that is distributed to each member of the travel club.

3. The regulation provides in part that:

   Contracts between charter operators and charter participants shall state:

   ....

   (x) That the charter operator is the principal and is responsible to the participants for all services and accommodations offered in connection with the charter. However, the contract may expressly provide that the charter operator, unless he is negligent, is not responsible for personal injury or property damage caused by any direct air carrier, hotel, or other supplier of services in connection with the charter.

The Wilsons maintain that, by inserting this contractual language in its newsletter, American assumed the duties of an innkeeper, even though the language itself disclaims liability for any injury "caused by any negligent act on the part of any hotel." They note that the contract states that American is the principal and is responsible for any negligent act of its own with respect to the accommodations offered in connection with the tour. The Wilsons argue that, as principal, American stands in the shoes of its agent, Humphreys, and owes its patrons the duties of an innkeeper. As an innkeeper, in turn, American owes a duty to its guests to provide them with safe lodging.[4] The Wilsons assert that this duty required American to make some reasonable investigation into the safety of any accommodations that it promoted and recommended and to warn prospective patrons of any danger at the hotel that might affect them. *See* Appellants' Br. at 14–15.

We cannot accept the Wilsons' contention that American has assumed the duties of an innkeeper. The district court concluded that the newsletter's contractual language, "rather than establishing a duty[,] is a clear disclaimer by American of any duty to plaintiffs in this case once plaintiffs have deplaned." R. 16 at 8. We agree that this language constitutes a disclaimer. The Wilsons' interpretation of the contract makes the exculpatory language of the contract, language authorized by the applicable regulation, meaningless. It makes little sense to allow charter tour operators to disclaim contractually vicarious liability for the negligent acts of a hotel and then to impose on the charter operator direct liability as an innkeeper. Therefore, we conclude that the contract does not impose on American, as principal, the duties of an innkeeper.

### 2.

■ While we do not believe that the contract and the regulation impose the duties of an innkeeper on American, we note that a charter tour operator, as the principal responsible to tour participants for all the services and accommodations offered in connection with the charter tour,[5] cannot disclaim liability for injuries arising out of *its own* negligence. A charter tour operator, as principal, employs independent contractors such as airlines and hotels to provide transportation and accommodation services to its patrons.[6] Although a principal generally cannot be held liable for the torts of an independent contractor, Indiana law does allow a principal to be held liable for the torts of a hired independent contractor when the consequences of *the principal's own negligent failure to select a competent contractor* caused the harm upon which the suit is based. *See Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941, 946 (7th Cir.1984); *Hixon v. Sherwin–Williams Co.*, 671 F.2d 1005, 1009–10 (7th Cir.1982); *Wabash Co. v. Pearson*, 22 N.E. 134, 135 (Ind.1889); *see also Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1309–10 (D.C.Cir.1985); Annota-

---

14 C.F.R. § 380.32(x) (1988).

**4.** *See, e.g., Rocoff v. Lancella*, 145 Ind.App. 440, 251 N.E.2d 582, 585 (1969); *Lincoln Operating Co. v. Gillis*, 232 Ind. 551, 114 N.E.2d 873, 875 (1953); *see also Ember v. B.F.D., Inc.*, 490 N.E.2d 764, 769 (Ind.Ct.App.1986) (innkeeper-guest relationship is one of the "[f]amiliar relationships imposing a duty of reasonable care").

**5.** *See* 14 C.F.R. § 380.32(x) (1988), *quoted in* footnote 3, *supra.*

**6.** *See* Nelson–Jones, *The Responsibilities of Tour Operators*, Int'l Bus.Law. 34, 34 (February 1986) (discussing English case law). Under Indiana law, a hotel operator like Humphreys that provides hotel services for a charter tour under a contract or agreement with the tour operator, can be characterized as an independent contractor.

"An independent contractor is one exercising an independent employment under a contract to do certain work by his own methods, *without subjection to the control of his employer*, except as to the product or result of the work. *When the person employing may prescribe what shall be done, but not how it is to be done, or who is to do it, the person so employed is a contractor and not a servant.*" *Hale v. Peabody Coal Co.*, 168 Ind.App. 336, 343 N.E.2d 316, 321 (1976) (quoting *Prest–O–Lite Co. v. Skeel*, 182 Ind. 593, 106 N.E. 365, 367 (1914)) (first emphasis supplied). Because Humphreys operates its Holiday Inn free of any direct control or supervision from American, it provides its services to American as an independent contractor.

tion, *When Is Employer Chargeable With Negligence in Hiring Careless, Reckless, or Incompetent Independent Contractor,* 78 A.L.R.3d 910 (1977 and Supp.1988); Restatement (Second) of Torts § 411 (1965). This negligent selection theory would allow liability to be imposed upon American for its own negligence as principal, liability that it did not disclaim under its contract and cannot disclaim under the applicable federal regulation.

Although the Wilsons' allegation that American breached a duty to investigate the safety and security of the hotel accommodations that it included in its tour package can be construed as a claim based on a negligent selection theory,[7] their claim cannot survive American's summary judgment motion. American chose Humphreys to provide the hotel accommodations in its tour package. Humphreys operated a Holiday Inn. The hotel was located on Seven Mile Beach on Grand Cayman Island, British West Indies—a British Crown Colony. There is nothing in the record that indicates that the Holiday Inn Grand Cayman was located in a high-crime area, that the hotel experienced more safety and security problems than other resort hotels on the island, or that the level of criminal activity involving guests at the Holiday Inn Grand Cayman was unusually high for a large beach resort. In addition, American stated that, in considering guest safety and security at hotels included in its tour packages, it "rel[ied] on the general reputation" of the hotels involved. Appellants' App. at 350 (Answers to Plaintiffs' Second Interrogatories). American also knew that

Humphreys had security guards on the premises, and it had received no notice of any guest complaints regarding safety and security at the Holiday Inn Grand Cayman. *Id.* at 349. An officer of American had visited the island and engaged in face-to-face negotiations over rates and payment policies with representatives of the hotel. *Id.* at 88–92 (Deposition of Jack E. Richards, Jr., vice-president of American). Under such circumstances, American had no duty to make specific inquiries into guest safety or security at the Holiday Inn. *See Hixon,* 671 F.2d at 1010 (where independent contractor had a "good reputation," employer "had no duty to quiz him concerning the details of his experience"); *see also Pinkerton Farms,* 741 F.2d at 946 (where truck driver's previous employer gave him a good recommendation, failure to make specific inquiry into driver's driving record was not a breach of duty to exercise ordinary care).[8]

### 3.

▮ The Wilsons also argue that, under principles of Indiana tort law, American gratuitously assumed a duty to conduct a reasonable inquiry and to warn them of potential danger. They note that "Indiana recognizes the gratuitous assumption of a duty by one who, through affirmative conduct or agreement, assumes and undertakes a duty to act." Appellants' Br. at 26 (quoting *Ember v. B.F.D., Inc.,* 490 N.E.2d 764, 769 (Ind.Ct.App.1986)). The Wilsons assert that American has engaged in affirmative conduct by which it gratuitously assumed a duty to investigate and warn.

7. *See* Annotation, 78 A.L.R.3d at 931–35 (collecting cases where the failure of an employer to investigate the competency or qualifications of an independent contractor before selecting the contractor was held to indicate negligent selection).

8. *See also* Restatement (Second) of Torts comment c at 379 § 411 (1965), (One is "entitled to assume that a carpenter or plumber of good reputation is competent to do such work safely. In such case, there is no duty to make an elaborate investigation as to the competence of the carpenter or plumber. Indeed, there is no duty to take any great pains to ascertain whether his reputation is or is not good."). The Restatement explains that the duty to investigate the qualifi-

cations of a contractor depends in part on the character of the work to be performed and the danger to which others will be exposed if the contractor's work is not properly done. For most types of work, no elaborate investigation is required unless the employer knows that the contractor has a bad reputation or knows of facts that should lead him to believe that the contractor is not competent. An investigation into the contractor's actual competence may be required, however, where the work involved is highly dangerous unless properly done or requires peculiar competence and skill. The operation of a resort hotel does not seem to be that sort of potentially highly dangerous work.

They point to language American included in its travel brochure that was "designed to put the plaintiffs' minds at rest," Appellants' Br. at 26, and to the fact that American did undertake to make inquiries into some "conditions at the hotel" included in their tour (e.g., investigations into the political stability and climate of the country). The Wilsons argue that no reason has been suggested why these investigations should not also include an inquiry into the safety conditions at the hotel that American itself included in the tour.

We cannot accept the Wilsons' contention that any duty was gratuitously assumed by American in this case. The brochure language relied upon by the Wilsons (focusing on the "relaxed informality" of a Cayman Island vacation, *see* Appellants' Br. at 25) is mere "puffing." The language is not a guarantee of safety, and does not constitute affirmative conduct giving rise to a duty to investigate and warn. *Cf. Lavine v. General Mills, Inc.,* 519 F.Supp. 332, 336 (N.D.Ga.1981) ("a general promise that the trip would be 'safe and reliable' does not constitute a guarantee that no harm would befall plaintiff"). In addition, American's practice of conducting "basic research" into the characteristics of the countries to which it sends tours does not constitute an assumption of a duty to investigate and warn. American's research gathered information concerning the general political conditions in the country, its stability, and its climate and geography. The information was obtained from books, the United States State Department, the tourist department of the country being researched, and the suppliers of services (hotels, ground transportation companies) in that country. *See* Appellants' App. at 67–68 (Deposition of Jack E. Richards, Jr., vice-president of American). American, however, does not seem to have investigated the security or level of criminal activity at *any* particular hotel. Its basic research consisted of a much more general inquiry. American's affirmative conduct may have given rise to a duty to perform its basic research in a reasonable fashion, but there is no reason to conclude that the fact that American engaged in generalized basic research

about the destinations of its tours obligated it to expand its investigations and constituted the assumption of a duty to investigate the safety records of individual hotels. *Compare Ember,* 490 N.E.2d at 770 (pub's distribution of a flyer imploring residents to call the pub before calling the police in the event of trouble in the neighborhood gave rise to a reasonable inference that the pub had assumed a duty to protect persons in the vicinity of the pub from criminal activity). Since the Wilsons have failed to show that any duty to investigate and warn exists or has been breached by American, the district court properly granted American's summary judgment motion.

### B. *Motion to Amend the Complaint*

The Wilsons maintain that the district court erred in denying their motion to amend their complaint. They sought to include in their complaint an additional claim alleging that American and Humphreys were joint venturers with respect to the hotel accommodations offered in American's tour to the Cayman Islands. By alleging that American and Humphreys were engaged in a joint venture, the Wilsons sought to impose upon American full responsibility for the duties of an innkeeper (including the duty to provide safe lodging) and to make American jointly and severally liable for any misconduct of its alleged joint venturer—Humphreys. *See* Appellants' Br. at 30 (citing the Indiana Uniform Partnership Act, Ind.Code §§ 23–4–1–13 & 23–4–1–15 (1988)).

The district court did not err in denying the Wilsons' motion to amend. While Rule 15(a) of the Federal Rules of Civil Procedure states that "leave [to amend a pleading] shall be freely given when justice so requires," the grant or denial of a motion to amend is committed to the discretion of the district court. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Thus, "[t]he denial of a motion to amend the pleadings pursuant to Rule 15(a) will be overturned only if the trial court abused its discretion." *Glick v. Koenig,* 766 F.2d 265, 268 (7th Cir.1985). In this case, we cannot say that the district

court abused its discretion by denying the Wilsons' motion to amend.

■ A district court does not abuse its discretion in denying a motion to amend when amending the pleading would be a futile act. *See Glick,* 766 F.2d at 268–69 ("The liberal amendment rules under Rule 15(a) do not require the courts to indulge in futile gestures."); *Wimes v. Eaton Corp.,* 573 F.Supp. 331, 335 (E.D.Wis.1983) ("In the absence of any apparent or declared reason—such as ... futility of the amendment—leave [to amend] should be freely given."). An amendment is a "futile gesture" if the amended pleading could not survive a motion for summary judgment. *See Collyard v. Washington Capitals,* 477 F.Supp. 1247, 1249 (D.Minn.1979). The Wilsons' amendment here would have been just such a futile act, since their amended pleading could not have survived a summary judgment motion.

■ The Wilsons maintain that the record before the district court contained a sufficient basis to justify the amendment of the complaint to allege a joint venture. The district court declined to accept that view. We believe that this decision was correct. Under Indiana law, a joint venture is "an association of two or more persons formed to carry out a single business enterprise for profit." *Boyer v. First Nat'l Bank of Kokomo,* 476 N.E.2d 895, 897 (Ind.Ct.App.1985); *Lafayette Bank & Trust Co. v. Price,* 440 N.E.2d 759, 762 (Ind.Ct.App.1982). In order for a joint venture to exist, the parties must be bound by an express or implied contract providing for "(1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking." *Boyer,* 476 N.E.2d at 898; *see Price,* 440 N.E.2d at 762. In addition, the joint venture agreement *"must* provide for sharing of profits." *Boyer,* 476 N.E.2d at 898 (emphasis supplied); *see also O'Hara v. Architects Hartung & Ass'n,* 163 Ind.App. 661, 326 N.E.2d 283, 286 (1975) ("it is usually necessary to show that each party re-

tains some control over the venture, *and that both profits and losses were to be shared"*) (emphasis supplied).

The record here does not provide a basis for alleging such an arrangement. Indeed, the record establishes that the relationship that existed between American and Humphreys was decidedly different than that required in a joint venture arrangement. While American and Humphreys may have engaged in coordinated promotional activities for their mutual advantage, and American was paid for the promotional services it performed, the record contains no evidence of any agreement to share profits and losses and no evidence that American had anything near an equal right to direct the operations of the hotel. Under these circumstances, we cannot say that the district court abused its discretion when it denied this eleventh hour bid to breathe new life into the litigation.[9] Given the record before it, the district court acted well within the bounds of its discretion in refusing to give great weight to the Wilsons' conclusory suggestion that additional discovery might turn something up that would support a joint venture theory.

### Conclusion

The judgment of the district court is affirmed. The Wilsons have not shown that American had any duty to investigate the safety conditions at the Holiday Inn Grand Cayman or to warn them of any potentially dangerous conditions at the hotel. Thus, the district court properly granted American's motion for summary judgment. In addition, the district court did not abuse its discretion by denying a motion to amend that was merely a futile act.

AFFIRMED.

---

9. The Wilsons filed their motion for leave to amend the complaint nearly twenty-two months after their complaint had been filed and three months after American had moved for summary judgment.