In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1376

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY CANTY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 38—**John W. Darrah**, *Judge.*

ARGUED JANUARY 8, 2007—DECIDED AUGUST 28, 2007

Before EASTERBROOK, *Chief Judge*, and ROVNER and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Anthony Canty was caught
with guns, drugs, and counterfeit money in his apart-
ment. When questioned by the police about the money,
Canty did not deny that it was counterfeit (a wise choice,
the police having found the phony money sitting in a
printer tray in Canty's apartment, on 8.5 x 11 inch pieces
of paper, with genuine bills taped to the screen of a nearby
scanner). Instead, he explained that he was printing
the money to give the police for their use as "flash money"
in undercover drug operations. Canty was not just feel-
ing philanthropic; he later told the grand jury that he
was hoping to win over the good graces of the police for

consideration in pending drug charges Canty was facing. Canty was tried for counterfeiting money, in violation of 18 U.S.C. § 471, as well as for numerous drug and gun charges not relevant to this appeal. At trial, when Canty took the stand in his own defense, the district court precluded him from testifying about his motivation for printing the money. The court reasoned that Canty's story amounted to a public authority defense, which Canty was trying to present without giving the government the advance notice required by FED. R. CRIM. P. 12.3. Canty was convicted on all charges and sentenced to 360 months' imprisonment.

Canty raises two challenges to his counterfeiting conviction on appeal. First, he argues that the district court violated his constitutional right to testify by limiting his testimony. He contends that Rule 12.3 was not applicable, because he was not raising a public authority defense. In his view, his explanation was offered solely to prove that he lacked any intent to defraud, a required element under 18 U.S.C. § 471. Moreover, he argues, even if Rule 12.3 is relevant, the rule may not be enforced by restricting a defendant's testimony. The government concedes that the court below erred, but it argues that the error was harmless. Canty also asserts that the evidence was insufficient to convict him under the counterfeiting statute. We agree with Canty that the district judge improperly limited his testimony and that the error was not harmless. Because we vacate his conviction and remand for a new trial on the counterfeiting charge, we do not reach the sufficiency of the evidence claim.

# I

On January 11, 2004, Canty was stopped in the hallway of his apartment building by two police officers who had received a tip that drugs were being sold at that

location. Because Canty appeared to be covering up something in the front part of his pants, one of the officers patted Canty down and felt what he believed to be a handgun. Canty then fled down the hall and into his apartment, where he locked the door. The officers, by then joined by four more officers, broke down Canty's door and entered his apartment where they saw Canty trying to stash three handguns inside the speaker area of his television set. They promptly arrested him and proceeded to search the rest of the apartment. The search turned up a shoebox containing marijuana, crack cocaine, a cocaine and heroin mixture, and $1,806 in cash. Most relevant to this appeal, the officers also found substantial evidence that Canty was producing counterfeit money. They seized a Hewlett Packard color ink jet combination printer/scanner/copier. Two genuine bills—of $50 and $100 denominations—were taped to the scanner screen and the printer tray contained a stack of 8.5 x 11 inch sheets of paper on which were printed reproductions of the genuine bills in various stages of production. Only the front or the back of a particular dollar bill appeared on some of the sheets of paper; others had double-sided copies containing the front side of a bill on one side and the back side of the bill on the other.

Shortly after his arrest, Canty agreed to be interviewed by Secret Service Special Agent Bradley Boydston. Canty admitted to Boydston that he was in fact manufacturing the money and that he intended to produce $30,000 worth of counterfeit bills. His excuse for this questionable behavior was that he was producing the money in an effort to assist the Chicago Police Department ("CPD") in attempting to purchase drugs from a drug supplier that they were trying to arrest. Canty told Boydston that he was helping to generate "flash" money for the police—cash that a potential drug buyer (or undercover police officer) would show (that is, "flash") to a potential seller in order demonstrate to the seller that the buyer had sufficient

funds to close the deal. Flash money is generally not exchanged in a drug bust operation; typically, the police swoop in and make an arrest once the presence of drugs is confirmed. Canty admitted that no one in the CPD told him to print the counterfeit money; he decided to do so "on [his] own."

On April 13, 2004, Canty appeared before the grand jury. Regarding the counterfeit money, Canty again admitted that he was in the process of making counterfeit money when the police entered his apartment. In response to a juror's question about how long Canty had been making the money, Canty said,

> Actually it was something new, and it was pertaining to the assistance of an officer who I was trying to assist while I was out in the world. I was—he alluded that he needed some help in some things and he couldn't do it. He did not tell me to do it, but I, you know, told myself the best thing to do is to get the money because we were trying to make a buy and fighting another charge statewise, [*sic*] sir.

The grand jury was not dissuaded by Canty's story from returning an indictment on six counts: three drug charges, two firearm charges, and one count of manufacturing counterfeit currency under 18 U.S.C. § 471.

Canty was tried by a jury on February 7, 2005. To support the counterfeiting charge, the government entered Canty's grand jury testimony into evidence, and Boydston testified about Canty's post-arrest statements. Before Canty took the stand in his own defense, the government moved *in limine* to preclude Canty from testifying about his motivation for counterfeiting the money. The government contended that Canty's explanation—that he was making the money to give to the police to aid in their investigation—constituted a public authority defense. Under Rule 12.3 of the Federal Rules of Criminal Procedure, "If a defendant intends to assert a defense of

actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing . . . within the time provided for filing a pretrial motion, or at any later time the court sets." FED. R. CRIM. P. 12.3(a)(1). The government argued that it had never received any such notice, and so Canty's testimony should be barred.

Canty responded by denying that he was asserting a public authority defense. Rather, he claimed, he was attempting to show simply that he lacked the requisite intent to defraud under 18 U.S.C. § 471. Canty wanted to tell the jury that he printed the money to ingratiate himself with the police for potential favorable consideration in a separate pending drug case, not because the police had authorized him to do so. The district judge agreed with the government that Canty was attempting to advance a public authority defense and that he had failed to provide the government with the required notice under Rule 12.3. Accordingly, the court limited Canty's testimony on the counterfeiting charge to the following colloquy with his attorney:

> Q: Mr. Canty, with regard to this counterfeit money that was there in the apartment.
>
> A: Yes, sir.
>
> Q: Were you intending to try to pass that counterfeit money at stores and banks and so on?
>
> A: No, sir.
>
> Q: And were you in fact making that money in hopes of ingratiating yourself with some police officer in connection with an investigation?
>
> A: Absolutely.

As noted, Canty was convicted on all six charges.

Canty moved in the district court for a new trial on various grounds, including that the district court improperly limited his testimony on the counterfeiting charge. The district judge denied the motion, again citing Canty's failure to provide notice of his public authority defense under Rule 12.3.

## II

The government concedes, and we agree with it, that the district court erred by restricting Canty's testimony on the counterfeiting charge at trial. As the defense has correctly argued throughout this litigation, Canty's proposed testimony did not implicate the public authority defense, and so Rule 12.3 should never have been consulted in the first place. The public authority defense excuses criminal behavior when a defendant was exercising "actual or believed . . . public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense." FED. R. CRIM. P. 12.3(a)(1). It is premised on the notion that a public official somehow authorized otherwise illegal activity.

Here, Canty consistently and affirmatively denied that any official authorized his counterfeiting activity. His point was that he lacked the requisite intent to defraud required by 18 U.S.C. § 471, since (acting on his own initiative) he was creating the money to give to the police to use for their own investigatory purposes. In his grand jury testimony, Canty stated that the officer he was assisting "did not tell [him] to do it," that Canty "told [himself] the best thing to do is to get the money because we were trying to make a buy and fighting another charge statewise. . . ." Officer Boydston testified at trial that Canty said from the beginning that nobody told him to print the money, that he "did it on [his] own." Defense counsel tried to explain to the district judge that Canty

was "not claiming the police authorized him to make the money. In fact, what he told [Officer Boydston] was just the opposite, that he was doing it on his own. The officer said that they didn't have any money to use, so [Canty] figured he would make some money." Canty's assertion that he counterfeited money without any intent to defraud someone with it is not at all the same as a claim that he believed he had official permission to make the money. Only the latter is a "public authority" defense that triggers the notice provision of Rule 12.3. Since Canty never attempted to advance a public authority defense, Rule 12.3 never should have come into play.

Even if Rule 12.3 had some residual relevance here, the district court's ruling would still have been erroneous. Rule 12.3(c) states, "If a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness regarding the public-authority defense. *This rule does not limit the defendant's right to testify*." FED. R. CRIM. P. 12.3(c) (emphasis added); see also MOORE'S FEDERAL PRACTICE § 612.3.04 ("If a party fails to comply with the requirements of Rule 12.3, the court may exclude the testimony of any undisclosed witness regarding the public-authority defense. Alternatively, the court can grant a continuance, order a mistrial, or allow the failure to comply with the Rule to be used for impeachment purposes. Because of a concern regarding a defendant's constitutional right to testify, one thing the court cannot do is exclude the defendant's own testimony.").

Canty's reason for wanting to testify was directly related to the intent element of the counterfeiting statute, § 471. To support his claim that he lacked any intent to defraud, Canty wanted to give the jury a more thorough and detailed version of events than the minimal colloquy that the district judge permitted. Since the plain language of the rule expressly precludes the very sanction the district court imposed, the district court erred by prohibit-

ing him from doing so. The only remaining question is whether the error was harmless. See FED. R. CRIM. P. 52(a).

The government advances two reasons why it believes the error was harmless. First, it argues that Canty's defense does not actually demonstrate a lack of intent to defraud. Instead, it merely shows that he intended to defraud whichever drug dealer was the ultimate target of the police. The government believes that this type of transferred intent is sufficient to satisfy the intent requirement of 18 U.S.C. § 471. Second, the government maintains that Canty's defense was sufficiently presented to the jury through other evidence and that his proposed testimony would have been cumulative.

We disagree with the government that Canty's stated motivation for printing the money, if believed by a jury, inevitably shows an intent to defraud *someone*. 18 U.S.C. § 471 states, "Whoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States, shall be fined under this title or imprisoned not more than 20 years, or both." The term "defraud" is commonly defined as "caus[ing] injury or loss to (a person) by deceit." BLACK'S LAW DICTIONARY (8th ed. 2004). Canty's plan, an effort to curry favor with the police, was to give the money to the police for their own use of it as "flash" money in undercover drug busts. The government is correct that Canty cannot escape criminal liability merely because the ultimate victim happens to be a drug dealer or because a third party (that is, the police) was to conduct the actual transaction. See *United States v. Wolfe*, 307 F.2d 798, 800 (7th Cir. 1962) (finding the defendant had an intent to defraud when he knowingly passed counterfeit bills to a third party whom the defendant knew would spend the money).

We would have a different case if Canty had intended to use the money to *buy* drugs or had encouraged the

police to do so. But his idea was different. He was manufacturing the phony bills (or so he wanted to tell the jury) just so that they could be "flashed," which we understand to mean simply displayed in a manner that establishes some legitimacy as a drug buyer, as opposed to exchanged for value. Neither the money nor the drugs were ever intended to change hands. Much like the notion in contract and other areas of law that "puffing" about the quality of one's wares does not give rise to actionable fraud, see, *e.g.*, *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003) (holding that "sales puffery" cannot constitute mail fraud to support RICO claim); *Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 391 (7th Cir. 1989), the act of promoting one's self as a wealthy or seriously interested buyer cannot be considered by itself to cause injury or loss by deceit. Unless goods are actually exchanged for the false money, flashing a large roll of cash is just puffery by the buyer, as opposed to the seller. The act of flashing play money in order to appear more affluent and therefore be taken more seriously as a buyer is no more fraudulent than, for example, wearing a fake Rolex watch for the same reason. It may tend to exaggerate one's financial worth or inspire interest in the sale, but it is not fraud.

Nor, on this record, can we characterize Canty's proposed testimony as cumulative. The government maintains that Canty's story was presented to the jury three different times; first, through Canty's grand jury testimony, which was introduced at trial; second, through Agent Boydston's recitation of Canty's post-arrest statement, and third, through the limited testimony that Canty was permitted on the subject. But a closer look at these three sources shows that they are not so conclusive. To begin with, the grand jury testimony and post-arrest statement, which were presented as part of the government's case-in-chief, in fact created some confusion as to

what Canty specifically intended. While Boydston relayed the fact that Canty intended to make "flash money," Canty stated to the grand jury that he printed the money because "we were trying to make a buy. . . ." Thus, the government's evidence presented a muddled picture on Canty's true motivation. What paltry testimony the district court did allow Canty to present did little to clarify his story. The court permitted Canty to answer three leading questions that established solely that Canty was hoping to ingratiate himself with the police by making the money and that he had no intention of "pass[ing] the counterfeit money at stores and banks. . . ." He was not able to say anything about flash money.

Whether Canty was properly convicted under § 471 turns entirely on the question whether he had a specific intent to defraud. We conclude that his version of the events, while certainly nothing that a jury would be compelled to believe, was not so farfetched that the district court could exclude it from their consideration. Nothing else served as an adequate substitute for Canty's proposed testimony. We therefore conclude that the district court's error was not harmless.

### III

We note, finally, that Canty has confined his appeal to the conviction on the charge of violating 18 U.S.C. § 471. Nothing we say here should be understood as disturbing in any way his convictions on the remaining counts of the indictment. We VACATE the judgment of conviction on the counterfeiting charge and REMAND for a new trial on that count.

No. 06-1376                                              11

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*