In the Matter of the Complaint of BOY SCOUTS OF AMERICA, Mount Diablo Silverado Council as owner of the vessel M/V ST. AMBROSE; and Explorer/Sea Scout Post No. 248 as owner pro hac vice of the vessel M/V St. Ambrose for Exoneration From or Limitation of Liability.

### No. C–93–2958 MHP.

United States District Court,
N.D. California.

Aug. 22, 1994.

David J. McMahon, John S. Pierce, Barger & Wolen, San Francisco, CA, for plaintiffs Boy Scouts of America, Mount Diablo Silverado Council, M/V St. Ambrose, Explorer/Sea Scout Post No. 248.

Philip T. Prince, Philip T. Prince Law Offices, San Francisco, Joseph W. Klobas, Joseph W. Klobas Law Offices, Santa Barbara, CA, Roger W. Patton, Lawrence A. Boxer, Patton Wolan & Boxer, Lyle C. Cavin, Jr., Lyle C. Cavin Jr. Law Offices, Oakland, CA, for claimant Patrick Sean Graham.

Toby M. Magarian, Rand L. Chritton, Archer McComas & Lageson, Walnut Creek, CA, for claimant William Brazil.

### *MEMORANDUM & ORDER*

PATEL, District Judge.

Petitioners Boy Scouts of America, Mount Diablo Silverado Council ("Mt. Diablo") and Explorer/Sea Scout Post No. 248 ("Post No. 248" or "the Post") brought this action for exoneration from or limitation of liability pursuant to 46 U.S.C.App. § 183 on the basis of this court's admiralty and maritime jurisdiction. Now before the court are two motions for summary judgment, one by each petitioner, and claimant Patrick Sean Graham's motion to amend his answer and claim.

Having considered the parties' arguments and submissions, and for the reasons set

forth below, the court enters the following memorandum and order.

## BACKGROUND

The facts relevant to this action can be summarized briefly.[1] On June 18, 1992, claimant Patrick Graham, then twenty-nine years old, sustained injuries when he dove off the vessel the M/V St. Ambrose ("the Ambrose") into shallow water. The Ambrose is a wooden vessel manufactured in 1954, which Mt. Diablo obtained from the United States Army in 1989. At all times relevant to this action, the Ambrose was owned by Mt. Diablo, and Post No. 248 was the owner *pro hac vice*. The Certificate of Documentation for the Ambrose stated that it was documented for "Coastwise Fishery."

On June 18, 1992 the Ambrose was on a Post-sponsored summer cruise that had begun on June 12th. Aboard the vessel were two adults (Graham and William Brazil) and four youths, ages 13 to 16 (Jeremiah Brazil, Joshua Brazil, Keir Moorehead, and Joshua Cook). Graham was a volunteer adult leader who was not paid for his role on the Ambrose. At the time of the accident Keir Moorehead, age 13, was at the helm of the Ambrose and Jeremiah Brazil was the bos'n. Following William Brazil's instructions, Keir Moorehead slowly steered the vessel close to shore and intentionally beached it adjacent to Brannan Island. This beaching had been discussed at a ship board meeting, at which Graham was present. Deposition of Patrick Graham, at 501–02.

According to Graham, no one on board told him not to dive in the water, and no one informed him that the vessel was beached. No one on board ordered Graham into the water, and he concedes that there was no urgency for him to get into the water. Rather, he entered the water in order to moor the vessel to keep it from drifting. Before diving, Graham walked to the outside stanchions of the vessel, stepped over the stanchions, and paused several seconds before diving into the water. He did not measure the depth of the water prior to diving, which, unbeknownst to him, was only roughly eigh-

teen inches to three feet deep. As a result of his dive Graham sustained severe personal injuries, and was rendered a quadraplegic.

Graham filed a negligence action against petitioners in Contra Costa County Superior Court. On August 13, 1993 petitioners filed this action in federal court, seeking exoneration from or limitation of liability. By order filed August 18, 1993 this court issued a monition that the deadline for filing claims and answers to the complaint was September 14, 1993. On September 14, Graham filed an answer to the complaint, but made no affirmative claims. *See* Answer to Complaint for Exoneration from or Limitation of Liability. Three days later, and without leave of the court, Graham filed what he captioned an "Amended Answer," a document identical to his first answer with an attached affirmative claim. *See* Amended Answer to Complaint. The affirmative claim alleged negligence against petitioners and sought $10 million *in contribution and indemnity. Id.* The court allowed the amended answer to be filed on September 22, 1993.

On March 25, 1994 Graham filed an ex parte application for an order shortening time in which to file a motion for leave to file an amended claim. The proposed amended claim adds a jurisdictional basis (the Jones Act, 46 U.S.C.App. § 688), a charging allegation (that the Ambrose was unseaworthy and improperly manned), and changes the relief sought from contribution and indemnity to maintenance and cure. *See* Amended Claim for Damages. On April 13, this court ordered petitioners to file an opposition to the motion to amend, which they did on April 20. That motion has been submitted on the papers. On May 6, 1994 both Mt. Diablo and Post No. 248 filed separate motions for summary judgment, with Mt. Diablo joining in the Post's motion as well.

At the hearing on this matter, it became apparent that further briefing was necessary on two issues: (1) Graham's status as a Jones Act seaman; and (2) Graham's entitlement to bring a claim for unseaworthiness. The par-

---

1. Except as otherwise indicated, all facts in this section are taken from the Joint Statement of

Undisputed Facts submitted by the parties.

ties filed simultaneous briefs on these issues on June 23, 1994, and the matter has been taken under submission.

## LEGAL STANDARD

### A. Leave To Amend

Federal Rule of Civil Procedure 15(a) provides for the amendment of pleadings by leave of court and notes that such leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, the grant or denial of a motion to amend is committed to the discretion of the district court, and denial is proper where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 772 (9th Cir.1991). An amendment is considered futile where the added claim could be defeated by a motion to dismiss or for summary judgment. *See Wilson v. American Trans Air, Inc.,* 874 F.2d 386, 392 (7th Cir.1989).

### B. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations, *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, and the inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

## DISCUSSION

Graham concedes in his papers that petitioners are entitled to summary judgment if the court denies his motion to amend. Accordingly, as the motion to amend may be dispositive of this matter, the court will address that motion first.

Graham argues that he should be granted leave to amend his claim to (1) allege jurisdiction under the Jones Act on the basis that Graham was a seaman; (2) add a charging allegation that the Ambrose was unseaworthy and improperly manned; and (3) change the claim for relief from contribution and indemnity to maintenance and cure. In support of his motion Graham argues that he should not be precluded from reaching the merits of his claim due to a simple mistake, and that there would be no prejudice to petitioners if such amendment were allowed.

In response, petitioners make a series of arguments. First, petitioners argue that the motion to amend is really nothing more than a disguised application to seek leave from default for Graham's failure to file a timely claim in the first place, and that Graham's counsel has failed to show any reason for failing to file in a timely fashion or for waiting an additional six months to seek this amendment. Second, petitioners contend that the motion should be denied because at the November 12, 1993 status conference this court ordered that the issue of the timeliness of the original amended answer and related issues would be addressed on summary judgment. Third, petitioners argue that they would be prejudiced by the amendment because it drastically changes Graham's theory of the case and would require extensive additional discovery. Finally, petitioners argue that the proposed amendment would be futile, as by Graham's own admissions he was a volunteer and not a seaman, and therefore

cannot maintain an action under the Jones Act. Because petitioners' final argument—that the proposed amendment would be futile—is dispositive, the court need not address the remaining arguments.[2]

In deciding whether Graham should be permitted to amend his claim, one factor for the court to consider is whether his proposed amendment would be futile, in that it could be defeated by a motion to dismiss or for summary judgment. *See Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *Wilson,* 874 F.2d at 392. If the facts in the record establish that Graham cannot maintain an action under the Jones Act, or under the warranty of seaworthiness, or that such claims would be defeated on summary judgment, his amendment would be futile and his motion to amend should be denied.

### A. Jones Act

In his proposed amended claim, Graham seeks to allege a cause of action under the Jones Act, seeking relief in the form of maintenance and cure. To that end he alleges that he was a crew member aboard the Ambrose, and that the vessel was unseaworthy and improperly manned. In order to maintain an action under the Jones Act, a claimant must establish that he was injured in the course of employment as a seaman. 46 U.S.C.App. § 688. Petitioners contend that on the evidence now in the record, Graham cannot show that he was a seaman injured in the course of employment.

In order to prove status as a "seaman" within the meaning of the Jones Act, a claimant must establish a more or less permanent connection with a vessel engaged in navigation. *See Estate of Wenzel v. Seaward Marine Services, Inc.,* 709 F.2d 1326, 1327 (9th Cir.1983). The Supreme Court has recently put the point succinctly: "the key to seaman status is employment-related connection to a vessel in navigation." *McDermott Intern., Inc. v. Wilander,* 498 U.S. 337, 355, 111 S.Ct. 807, 817, 112 L.Ed.2d 866 (1991). Petitioners argue that Graham has failed to

submit any evidence to establish that he was permanently associated with the Ambrose in an employment-related context. They contend that the evidence reveals that Graham was merely a temporary volunteer supervising and training youths, and therefore not a Jones Act seaman.

While determination of whether a particular individual is a seaman is usually fact-specific, "[s]eaman status is a jury question only if there is evidence that ... the plaintiff was 'assigned permanently to a vessel ... or performed a substantial part of his work on the vessel....'" *Coats v. Penrod Drilling Corp.,* 5 F.3d 877, 890 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1303, 127 L.Ed.2d 654 (1994), *reh'g en banc granted,* 20 F.3d 614 (1994). Mere transitory association with the vessel is insufficient as a matter of law to establish seaman status under the Jones Act. *See Bullis v. Twentieth Century–Fox Film Corp.,* 474 F.2d 392, 394 (9th Cir.1973). Thus, absent evidence that Graham was working aboard the Ambrose in a more or less permanent status in an employment-related position, he cannot maintain an action under the Jones Act.

Graham has failed to satisfy his burden. All of the evidence in the record indicates that Graham was essentially a chaperon of sorts—he was an adult volunteer on board the Ambrose to supervise and train youths during a short, predominantly recreational cruise. Graham has submitted no evidence that suggests he was in any way permanently associated with the Ambrose or serving aboard the vessel in an employment-related context. The record reveals the following facts: (1) Graham was not paid for his services (Joint Statement of Undisputed Facts, # 18); (2) Graham viewed his status on board as that of a "volunteer" (Declaration of David McMahon, Ex. B, Plaintiff's Responses to Interrogatories, Response No. 2.11 B); (3) Graham was not "hired," but rather signed up with the Post as a volunteer adult supervisor (Declaration of Philip Prince, Ex. 16, William Brazil's Responses to Special Interrogatories, Response No. 31); (4) Graham

---

2. However, the court notes that Graham's counsel has offered no reason for waiting until this late date to attempt to amend his claim to state a cause of action under the Jones Act. Certainly, no new facts have developed in the interim.

understood that part of his job on the Ambrose was to supervise and train the youths along with the Skipper, Mr. Brazil, as well as to serve as Brazil's mate (Graham Depo., at 149–50); and (5) the Ambrose was not a commercial venture or on a serious training mission, but was engaged in a primarily recreational cruise that included skiing, suntanning and swimming as well as basic, informal nautical instruction for the underage crew of Boy Scouts (Deposition of Patrick Graham, at 207–217, 250). All of this evidence supports the conclusion that Graham was not a seaman within the meaning of the Jones Act, and Graham has pointed to no evidence in the record that suggests that he was associated with the Ambrose in other than a transitory, non-employment related capacity.

Nothing in the case law requires a contrary conclusion. In almost every case where courts have found that seaman status exists (or held that the issue must be left for the jury), there is undisputed evidence that the claimant was engaged in employment-related activity on board the vessel. See *McDermott*, 498 U.S. at 355, 111 S.Ct. at 817 (claimant assigned to vessel as paint foreman); *Estate of Wenzel*, 709 F.2d at 1327 (plaintiff employed as diver assigned to clean vessel); *Mach v. Pennsylvania Railroad Co.*, 317 F.2d 761, 762 (3rd Cir.1963) (plaintiff employed as bargeman on vessel); *Bailey v. Pilots' Ass'n for Bay & River of Delaware*, 406 F.Supp. 1302, 1304 (E.D.Pa.1976) (plaintiff was pilot-trainee assigned to vessel). Indeed, the Supreme Court has held that the sine qua non of seaman status is *employment-related connection* to a vessel. See *McDermott*, 498 U.S. at 355, 111 S.Ct. at 817.

While one district court has held that unpaid volunteers serving on vessels in a temporary capacity can rise to the level of seaman in certain circumstances, the facts of that case are distinguishable in crucial ways from the facts of the instant action. In *In re Petition of Read*, 224 F.Supp. 241, 245–47 (S.D.Fla.1963), the court held that an unpaid volunteer joining a racing yacht crew for the duration of a race qualified as a Jones Act seaman. However, as a later court explained, the holding in *Read* was premised on the fact that "the plaintiff had explicitly

agreed to perform the duties of a full crew member and to be subject to the control of the defendant-shipowners." *Heath v. American Sail Training Ass'n*, 644 F.Supp. 1459, 1469 (D.R.I.1986). On the facts before it, the court in *Heath* found that contrary to *Read*, there was no evidence that the plaintiff was sufficiently under the defendants' control to establish the requisite employment relationship. *Id.; see also Complaint of Falkiner*, 716 F.Supp. 895, 902–03 (E.D.Va.1988) (holding that claimants serving as unpaid volunteers aboard a vessel for their own amusement who were jointly participating in the venture and were not under the control of anyone else, except the captain as to general safety rules, were not sufficiently "employed" to qualify as seamen under the Jones Act).

In the instant case there is no evidence that Graham was serving as a subservient crew member under the control of anyone else. Rather, it is clear that Graham was one of two adult volunteers jointly participating in the excursion who together were in charge of navigating the Ambrose on a primarily recreational cruise and supervising its underage crew. There is simply no authority for the proposition that such a position rises to the level of seaman status under the Jones Act.

Based on the evidence in the record, the court finds as a matter of law that Graham was not a seaman within the meaning of the Jones Act, and therefore cannot maintain an action under that statute.

### B. *Unseaworthiness*

■ Graham also seeks to amend his claim to allege a cause of action for unseaworthiness. He argues that regardless of his status as a Jones Act seaman, he is entitled to the protections of the warranty of seaworthiness because he was performing seaman's work at the time of his injury. In response, petitioners first argue that the *Sieracki* seaman doctrine has been abolished, such that the warranty would not apply even if Graham were performing seaman's work. In the alternative, petitioners contend that Graham was *not* engaged in seaman's work at the time of his injury, but rather was a joint participant in a recreational cruise.

Unseaworthiness is a judicially-created remedy established by the Supreme Court in *The Osceola*, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). *The Osceola* defined the remedy as one for "indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship." *Id.* at 175, 23 S.Ct. at 487. Though a species of negligence, unseaworthiness is a form of strict liability imposed upon the vessel owner for failure to supply a seaworthy vessel and crew. It is also a warranty premised on the theory that a vessel owner warrants to the seaman a seaworthy vessel and crew. Courts have said that this strict liability or warranty is justified by a special solicitude for seamen, who find themselves at sea at the mercy of the condition of the vessel and the experience of the crew. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 387, 90 S.Ct. 1772, 1780, 26 L.Ed.2d 339 (1970).

In *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court extended the unseaworthiness benefits under *The Osceola* to longshore workers. The Court held that "for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner." *Id.* at 99, 66 S.Ct. at 879–80. The court thus extended a cause of action for those "doing a seaman's work and incurring a seaman's hazards." *Id.* However, in amending the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(b) in 1972, Congress made it clear that it was disavowing *Sieracki.* The House Committee report states:

> the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers. The rationale which justifies holding the

vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other non-seamen working on board a vessel while it is in port.

H.R.Rep. No. 1441, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 4698, 4703 [hereinafter "1972 House Report"].

Following these amendments, there was some question as to whether the amendments were intended to abolish the *Sieracki* seaman doctrine in toto, or whether the amendments only abolished it as to those workers explicitly covered by the LHWCA. The Ninth Circuit has held the sweep of the amendments to be broad, "eviserat[ing] if not eliminat[ing] *Sieracki.*" *Normile v. Maritime Co. of the Philippines*, 643 F.2d 1380, 1382 (9th Cir.1981). However, in *Normile* the court was faced with a plaintiff who was a federally employed longshore worker, and thus arguably covered by the LHWCA. *Id.* Thus, it is not certain that the Ninth Circuit intended to read the 1972 amendments as abolishing *Sieracki* seaman status altogether and for all potential plaintiffs.[3]

What is clear, however, is that extending the doctrine of unseaworthiness to a plaintiff in Graham's position stretches that doctrine beyond any reasonable interpretation. The entire rationale underlying the unseaworthiness cause of action is "to protect seamen from the extreme hazards incident to their *employment* which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers." 1972 House Report (emphasis supplied); *see also Garrett v. United States*, 574 F.2d 997, 1000 (9th Cir.1978) ("The doctrine of seaworthiness ... developed in recognition of the inherently dangerous nature of the work of seamen."). *Sieracki* provided that a ship-board worker not technically a seaman but performing seaman's work under seaman's conditions is entitled to the same protections because subjected to the same hazards. Petitioners are correct that Graham was subject to none of these hazards by virtue of his role on the Ambrose. As set out

---

**3.** The Fifth Circuit recently cited *Normile* as holding that the 1972 amendments abolished the *Sieracki* seaworthiness doctrine altogether, *Smith v. Harbor Towing & Fleeting, Inc.*, 910 F.2d 312, 313 & n. 1 (5th Cir.1990), *cert. denied*, 499 U.S. 906, 111 S.Ct. 1107, 113 L.Ed.2d 216 (1991), but based on this court's reading of *Normile*, that conclusion may overstate the Ninth Circuit's holding.

in the discussion of the Jones Act, *supra,* Graham was on a brief, primarily recreational, summer cruise supervising a troop of boy scouts, *not* "doing a seaman's work and incurring a seaman's hazards." *Sieracki,* 328 U.S. at 99, 66 S.Ct. at 880. That he occasionally performed duties like those of a seaman, as does any "sailor" who goes out to sea on a vessel for recreational or other non-employment related activities, does not thereby entitle Graham to *Sieracki* status. Thus, assuming arguendo the continuing vitality of the unseaworthiness cause of action for non-seamen, Graham does not qualify as a matter of law to state a claim under that doctrine.[4]

## CONCLUSION

For the foregoing reasons, Graham's proposed amendment to allege a cause of action under the Jones Act or for unseaworthiness would be futile, and his motion to amend is hereby DENIED. Graham has conceded that denial of his motion to amend is fatal to his case and that absent amendment he cannot oppose the motions for summary judgment; accordingly, petitioners' motions for summary judgment are hereby GRANTED.

IT IS SO ORDERED.

4. Because the court concludes that Graham is not entitled to bring a cause of action for unseaworthiness as a matter of law, it is unnecessary for the court to reach petitioners' contention that even if Graham were entitled to bring such an action, there was no causal relationship between the alleged unseaworthiness and the accident.