James D. CAVIN, Appellant,

v.

STATE of Alaska, FISH AND WILDLIFE
PROTECTION DIVISION OF the DE-
PARTMENT OF PUBLIC SAFETY, Ap-
pellee.

No. S–8630.

Supreme Court of Alaska.

April 7, 2000.

**324**

Eric Dickman, Dickman Law Group, Seattle, Washington, for Appellant.

Christopher M. Kennedy, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

I.  *INTRODUCTION*

After a non-jury trial, the superior court rejected James Cavin's maritime tort claims against his former employer, the State of Alaska, finding that he had failed to prove his status as a Jones Act "seaman" and that

federal statutes preclude his general maritime claims. Because the superior court evidently did not consider all of the evidence and applicable law bearing on the issue of whether Cavin was a Jones Act seaman and because we conclude that Cavin has a potentially viable maritime seaworthiness claim, we reverse and remand for further proceedings.

II.  *FACTS AND PROCEEDINGS*

A.  *Facts*

James Cavin worked as a state trooper for the Alaska Department of Public Safety, Fish and Wildlife Protection Division, and was stationed in Cordova beginning in 1983. Cavin served patrol functions both on land and on the sea, the latter aboard vessels called the ENFORCER, the COURAGE, and smaller vessels assigned to work with them. According to the parties' stipulation, "[t]he sea-based work included patrolling on the State's vessels, where Officer Cavin was to enforce Fish and Game laws and conduct rescue missions." Cavin alleges that the COURAGE and the smaller vessels on which he worked "had a propensity to pound on the waves and were therefore unseaworthy."

Cavin asserts that this pounding caused progressive injuries to his back. In early June 1988, following a period of working on commercial fish patrol, Cavin experienced an episode of low back pain, which his medical providers diagnosed as acute lumbar strain attributable to the pounding on the waves of the Fish and Game vessels on which he worked. Cavin missed several weeks of work, and upon his return to duty, his supervisor limited his duty to avoid aggravation of the injury. This resulted in a decrease in his sea-based duties.

In March and April of 1989, during the EXXON VALDEZ oil spill response, Cavin worked aboard the BURTON for a nine-day period. While leaning over the side of a boat to pull oil booms together, he suffered an injury to his cervical or thoracic spine. Soon after this injury, he was transferred to Soldotna. Subsequent events are not at issue: for present purposes the parties stipulate that "Cavin suffered injuries to his cervi-

cal/thoracic spine and lumbar spine during the period he was employed by the State, and that these injuries were caused at least in part by his work on State vessels."

## B. *Procedural History*

Cavin initially filed claims for his injuries under the Alaska Workers' Compensation Act and received compensation under the act. In 1990 this court decided *State, Department of Public Safety v. Brown*, which held that where a state employee is injured onboard a vessel the exclusive remedy provision of the Workers' Compensation Act does not bar the injured employee from pursuing federal maritime remedies.[1] Cavin learned of this case and filed his complaint against the state on November 4, 1991, alleging claims of Jones Act negligence,[2] general maritime negligence, unseaworthiness, and maintenance and cure.

His case proceeded to a non-jury trial. By agreement of the parties, the trial court bifurcated the trial into sequential phases. Phase I, which is now before this court, concerned two threshold issues: seaman status and statute of limitations. The parties left questions of negligence and causation for phase II, stipulating that the court could assume causation for purposes of deciding the phase I issues. Cavin and the state further agreed to try phase I without live testimony, instead using deposition transcripts, documentary exhibits, and a partial fact stipulation.

Prior to the phase I trial, the state moved for partial summary judgment based on the statute of limitations, arguing that Cavin could not recover for any injury suffered more than three years before November 4, 1991, the date he filed his complaint. The superior court deferred the question to trial.

After considering evidence presented in phase I of the trial, the superior court ruled that Cavin was not a "seaman" entitled to relief under the Jones Act; the court further ruled that federal law allowed Cavin no common law maritime claims. The court therefore denied Cavin's complaint without reaching phase II.

In explaining its ruling, the court focused on monthly summaries compiled by the state documenting the percentage of work time that Cavin spent on boats during 1987–89— his last three years in Cordova. These monthly summaries showed that, on average, Cavin spent 19.63% of his work time performing "solely boat duty"; they reflected an additional 25.80% of work time spent on "mixed boat and land" duty. Cavin argued that both categories of time should be credited to him as sea duty for purposes of determining his Jones Act seaman status. But the trial court rejected this argument, finding that

> this would require speculation by the court. There is no basis in the facts presented to assess all, or any, of the mixed time to vessel work without guessing. All that is possible is to say that something more than 19% of the time during those years Cavin worked on the boats.

The trial court then turned to the United States Supreme Court's ruling in *Chandris, Inc. v. Latsis*, which articulated a two-part test under which an employee is deemed a Jones Act seaman when (1) the employee's duties " 'contribute to the function of [a] vessel or to the accomplishment of its mission,' " and (2) the employee has "a connection to a vessel (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."[3]

Applying *Chandris*, the trial court found that "Cavin met all but the temporal requirement of the *Chandris* standard." The court observed that Cavin's "work on the boats was part of his job, but overall was only a small part of the broad range of largely land based duties of a Trooper assigned to Fish and Wildlife responsibilities." Referring to *Chandris*'s approval of a temporal guideline developed by the Fifth Circuit Court of Appeals, which generally finds seaman status for workers who spend a minimum of thirty

---

**1.** 794 P.2d 108, 110–11 (Alaska 1990).

**2.** 46 U.S.C. app. § 688(a) (1994).

**3.** 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (quoting *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)).

percent of their work time aboard a vessel, the trial court noted that "30% is a far cry from the 19% established by Mr. Cavin's evidence." The court went on to conclude:

> Although [Cavin's] failure to meet the general guideline of 30% endorsed by *Chandris* is not in itself determinative, an overall view of his year round job does not leave this court with the impression that he was a marine worker, let alone a worker who was sea-based and owed his allegiance to the fleet of Fish and Wildlife vessels.

The trial court also decided that Cavin had no general federal maritime remedy for unseaworthy conditions under the "*Sieracki* doctrine."[4] Citing a 1981 Ninth Circuit decision,[5] the court ruled that Congress had extinguished the *Sieracki* doctrine by enacting the 1972 amendments to the Longshore and Harbor Workers' Compensation Act.[6]

Having decided that Cavin had no claim under the Jones Act because he was not a seaman and that he had no common law maritime claim, the trial court found no need to rule on the statute of limitations, stating that "the issue of the applicable statute of limitation period is moot." The court subsequently awarded prevailing-party attorney's

fees and costs to the state and entered judgment against Cavin.

Cavin appeals.

## III. DISCUSSION

### A. Standard of Review

■ The application of maritime remedies involves mixed questions of law and fact. We review the superior court's factual findings under the clearly erroneous standard but review questions of law de novo.[7]

### B. Jones Act

The Jones Act states: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury...."[8] Congress passed the Jones Act out of its dissatisfaction with the bar to negligence suits that the Supreme Court had established in a 1903 decision.[9] But in establishing a maritime remedy, the Jones Act created an enduring problem: it failed to define who was a "seaman" entitled to recovery under the act. The strongest guidance initially came from the Longshore and Harbor Workers' Compensation Act of 1927,[10] which excludes from its coverage "a master or member of a crew of any vessel."[11] Decisions after enactment

---

**4.** See *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

**5.** The superior court relied on *Normile v. Maritime Co. of the Philippines*, 643 F.2d 1380 (9th Cir.1981).

**6.** 33 U.S.C. §§ 901–950, 905 (1994 & Supp. III 1997).

**7.** See *Moody–Herrera v. State, Dep't of Natural Resources*, 967 P.2d 79, 82 (Alaska 1998); Alaska R. Civ. P. 52(a). The clearly erroneous standard of Rule 52(a) applies to documentary evidence as well. See *Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co.*, 482 P.2d 842, 845–46 (Alaska 1971). The federal standard appears the same: "We review the factbound findings of the district court sitting without a jury in admiralty jurisdiction under the 'clearly erroneous' standard of Fed.R.Civ.P. 52(a)." *Clauson v. Smith*, 823 F.2d 660, 661 (1st Cir.1987) (citing *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954)). See also 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2587, at 584–85 (2d ed.1995).

**8.** 46 U.S.C. app. § 688(a) (1994). F. Nash Bilisoly, *The Relationship of Status and Damages in*

*Maritime Personal Injury Cases*, 72 Tul. L.Rev. 493, 496 (1997) ("Seamen on government vessels qualify for Jones Act remedies only through incorporation by the Suits in Admiralty Act and Public Vessels Act."); see also 46 U.S.C. app. §§ 742, 781 (1994 & Supp. III 1997).

**9.** See *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (referring to *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903)).

**10.** See 33 U.S.C. §§ 901–950 (1994 & Supp. III 1997). The LHWCA itself was passed to compensate workers who were denied compensation by the Supreme Court in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 216–18, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), because they work neither on state land nor the federal seas, but over "the water's edge." See H.R.Rep. No. 1441, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4707.

**11.** See *Chandris*, 515 U.S. at 355, 115 S.Ct. 2172 (citing 33 U.S.C. § 902(3)(G) (1994)).

of the LHWCA took its language of exclusion as the Jones Act's language of inclusion: a seaman was deemed to be "a master or member of a crew of any vessel."

But competing notions of seaman status persisted, most significantly around the question of whether it was the status of the worker or the situs of the accident that made a Jones Act seaman. In two recent decisions, the Supreme Court expanded the notion of "seaman," determining that status, not situs, governs; but both decisions also restricted the notion by focusing on the nature of a seaman's activities.

In *McDermott International, Inc. v. Wilander,* the Court established that Jones Act coverage does not require that a worker be part of the navigational crew of a vessel, but only that the worker "contribute to the function of the vessel." [12] This led to speculation that any worker injured on a vessel could qualify as a Jones Act seaman, even if the worker's regular work was land-based. The Supreme Court addressed this issue in *Chandris, Inc. v. Latsis,* [13] establishing a standard to evaluate whether a worker's sea-based work is substantial enough to qualify for Jones Act seaman status.

In *Chandris,* Antonios Latsis was a salaried superintendent engineer who worked on the communications equipment of Chandris vessels. [14] Latsis was not assigned permanently to a vessel; he was based in Chandris's Miami offices but in the course of his work took a number of voyages on Chandris vessels. [15] While on a voyage aboard a Chandris vessel, Latsis developed a problem with his eye and ultimately sustained lasting damage. [16] He sued Chandris under the Jones Act for negligence by the ship's doctor in failing to refer him for immediate treatment of a detached retina, which he alleged would have prevented the damage. [17] A jury ruled against Latsis on seaman status, and the trial court entered judgment against him; but the federal Court of Appeals for the Second Circuit reversed, finding that the jury instruction on seaman status was plain error under circuit precedent. [18]

The Supreme Court granted certiorari to resolve a longstanding split among the circuits about the proper test to apply. [19] Analyzing its early case law, the Court recognized several fundamental distinctions. The first was one between land-based and sea-based maritime workers; the second, that admiralty jurisdiction depends not on the situs of the injury, but on the nature of service of the person injured—"[s]eaman status is not coextensive with seamen's risks." [20] In disavowing the "voyage test" favored by Justice Stevens's dissent, the Court seemed especially concerned that such a test would "permit a worker to walk into and out of coverage in the course of his regular duties." [21]

With this concern in mind, the Court fashioned a two-part test for seaman status. The first part is a threshold requirement that the worker "do the ship's work." [22] "But this threshold requirement is very broad: '[a]ll who work at sea in the service of a ship' are eligible for seaman status." [23] The parties here do not dispute that Cavin meets this standard.

The second part, and the focus of concern here, is the requirement that "a

**12.** 498 U.S. 337, 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991).

**13.** 515 U.S. at 349–50, 115 S.Ct. 2172.

**14.** *See id.* at 350, 115 S.Ct. 2172.

**15.** *See id.*

**16.** *See id.* at 350–51, 115 S.Ct. 2172.

**17.** *See id.* at 351, 115 S.Ct. 2172.

**18.** *See id.* at 352, 115 S.Ct. 2172.

**19.** *See id.* at 353, 115 S.Ct. 2172.

**20.** *Id.* at 360–61, 115 S.Ct. 2172.

**21.** *Id.* at 363, 115 S.Ct. 2172.

**22.** *Id.* at 368, 115 S.Ct. 2172.

**23.** *Id.* (quoting *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 354, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). The inquiry into seaman status is "of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it." *McDermott,* 498 U.S. at 356, 111 S.Ct. 807.

seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."[24] These dual elements of the second requirement—duration and nature—have independent importance in distinguishing "sea-based maritime employees" from "land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea."[25]

As a general guide to this inquiry, the *Chandris* Court stated, "we think it preferable to focus upon the essence of what it means to be a seaman and to eschew the temptation to create detailed tests to effectuate the congressional purpose, tests that tend to become ends in and of themselves."[26] Nevertheless, the Court approved as "an appropriate rule of thumb for the ordinary case" the "30 percent" test developed in the Fifth Circuit and followed by many courts. But it warned that this benchmark should "serve[ ] as no more than a guideline ... and departure from it will certainly be justified in appropriate cases."[27]

In the present case, Cavin insists that he meets the thirty percent benchmark. He asserts that the trial court erred in failing to credit him with any of the time that the state recorded as "mixed" and in failing to make the state bear the burden of explaining the mixed time, since, according to Cavin, the state failed to preserve more complete records providing the explanation. Cavin also contends that the benchmark in any event should not be interpreted strictly, because it is "merely a guideline and not a bright line test." Emphasizing the maritime nature of his work as a Fish and Wildlife officer, he argues that he was regularly subject to the

"perils of the sea," and so merits the Jones Act remedy.

The state responds that Cavin was a land-based worker whose duties included only "intermittent on-the-water work." To recognize such a worker as a "seaman" under the Jones Act, the state argues, would extend this maritime remedy to land-based workers merely because their jobs occasionally called them to the sea.

In our view, however, it would be premature to attempt a resolution of Cavin's seaman status under the Jones Act. Specifically, we find two aspects of Cavin's Jones Act claim that require a remand for additional trial court consideration.

First, although the trial court faulted Cavin for presenting insufficient evidence to satisfy the durational aspect of the second part of *Chandris*'s seaman test, the court evidently limited its consideration to the last three years of Cavin's service in Cordova, 1987–89. These were the only years covered by the state's monthly time allocation records. But the state's records were not complete: Cavin had been assigned to Cordova since May 1983.[28] In concentrating on his last three years in Cordova, the trial court apparently overlooked, or at least neglected to address, a substantial body of evidence that Cavin presented concerning his first four years of Cordova service.

We note in particular that in depositions designated as part of the phase I evidence, Cavin testified that he spent considerably more time performing sea-based duties during his initial years in Cordova. For example, he stated that the principal duty of the Cordova post in 1983–84 was "detachment," or "commercial fisheries enforcement and assistance of rescue to the fisherman." All troopers were assigned to this boat duty;

---

24. *Chandris*, 515 U.S. at 368, 115 S.Ct. 2172.

25. *Id.* As the Court more recently stated, "[f]or the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea." *Harbor Tug and Barge Co. v. Papai,* 520 U.S. 548, 555, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997).

26. *Chandris*, 515 U.S. at 369, 115 S.Ct. 2172.

27. *Id.* at 371, 115 S.Ct. 2172.

28. Cavin states in his complaint that he was employed as a seaman by the state since 1984, but the stipulation dates Cavin's service to August 1, 1983. Cavin states that he started this assignment in May 1983, and the record supports this.

"[d]uring the summertime, and throughout the wintertime, too, most of our duties are marine enforcement." Cavin claimed that when he was assigned to the ENFORCER during his first two years in Cordova, "we would go out and stay out. We would come in maybe one night a week or one night every three weeks if we were busy." Cavin testified that while the ENFORCER was stationed in Cordova he was "scheduled for 150 to 180 days and nights a year at sea.... And we would, several times, be gone for more than a month." Moreover, Cavin's deposition testimony, if accepted, might also support the inference that his first four years in Cordova were the years when he experienced most of the wear and tear—or "pounding"—to his low back that eventually necessitated his reassignment to light duty. In addition to the deposition testimony, Cavin submitted a substantial amount of documentary evidence covering these years of service.

But the trial court's decision makes no mention of Cavin's deposition testimony or his supporting documentary evidence. Though Cavin based his Jones Act claim on the theory that he had sustained progressive damage throughout his years of service in Cordova, the decision inexplicably restricts its discussion to evidence dealing with the last three years of Cavin's seven-year stay at that post. The state's statute of limitations defense, which covered Cavin's early years in Cordova, cannot explain the court's failure to address the evidence dealing with these years, since the court expressly declined to rule on the limitations defense, finding it moot. Moreover, by basing the denial of Cavin's claim on a finding that he had presented insufficient evidence, rather than on a rejection of the evidence that he actually did present, the trial court's decision strongly suggests that the omission goes beyond mere lack of discussion and that the court actually failed to consider the evidence of Cavin's first years of service.

Given these circumstances, we believe that it is necessary to remand this case for reconsideration and additional findings addressing Cavin's early years of service. We express no view concerning the ultimate weight and credibility of this evidence, leaving those issues to be determined by the trial court in light of other evidence in the record that may be relevant. But the totality of the evidence, viewed in the light most favorable to Cavin, at least makes a prima facie showing of seaman status. We therefore conclude that the trial court must evaluate Cavin's claim of seaman's status based on his entire period of service in Cordova.[29]

■ A second aspect of Cavin's Jones Act claim also requires the trial court's consideration on remand. In *Scott v. Briggs Way Co.*, we recognized that a worker whose job changes seasonally from land-based to sea-based duties might qualify as a Jones Act seaman only during the seasonal periods of sea-based assignment.[30] We thus ruled that an "expectant seaman" injured while performing land-based maintenance before the fishing season began was not covered by the Jones Act.[31] Our ruling drew upon *Chandris,* which states that "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well." [32]

Much documentary evidence in the present case arguably indicates that under the rationale of *Scott* and *Chandris,* Cavin's "basic assignment" may have changed seasonally, and he thus might qualify as a "seasonal seaman." Cavin's deposition testimony concerning changes that occurred in his job assignments during open fishing seasons might be read to support the same conclusion. If Cavin qualified as a seasonal seaman, he might be entitled to Jones Act relief for injuries occurring during his periods of sea-

**29.** The state urges us to address its statute of limitations defense as an alternative ground for upholding the trial court's decision. But because the issue potentially involves material fact disputes that the trial court has not yet resolved, we decline to decide it at this juncture. The trial court may in its discretion consider this defense as an alternative basis for its decision on remand.

**30.** 909 P.2d 345, 348 (Alaska 1996).

**31.** *See id.*

**32.** *See id.* at 347 (quoting *Chandris,* 515 U.S. at 372, 115 S.Ct. 2172).

based service. To be sure, Cavin's principal argument is that he was a year-round seaman. But we think that the seasonal aspect of sea-based work is an intrinsic factor in the analysis mandated by *Chandris*—a factor that must be taken into account for those whose regular work schedules are seasonally dictated. Even accepting at face value Cavin's claim to year-round seaman status, seasonal variations in his work would remain a relevant factor under the *Chandris* analysis, particularly in determining how stringently to apply the Fifth Circuit's thirty percent durational guideline and what seasons should be included in calculating a worker's overall percentage of sea-based work time.

Our review of the record in this case persuades us that on remand the trial court should reexamine the evidence for seasonal variations, in light of *Scott.*

### C. *Unseaworthiness and Maintenance and Cure Claims*

Cavin argues that even if the court rules against him on Jones Act seaman status, he is still entitled to a common law remedy for unseaworthiness given his status as a *"Sieracki"* seaman [33]—a status that Cavin prefers to call "vicarious seaman" status. Cavin argues that the superior court erred in ruling that this remedy has been extinguished by the 1972 amendments to the Longshore and Harbor Workers' Compensation Act (LHWCA).[34] The state, citing *Normile v. Maritime Co. of the Philippines* [35]—the case relied on by the trial court—responds that "[t]here is no such thing as a *Sieracki* seaman," maintaining that "[t]he 1972 amendments ended the judicially-created *Sieracki* remedy."

But while it may be true that the 1972 amendments extinguished *Sieracki* seaman status for longshore and harbor workers, the same does not appear to hold true "for those workers who 'fall into the crack between seamen and longshore workers.'" [36]

■ The test of seaman status for purposes of the unseaworthiness remedy is not rigorous: the Supreme Court expanded this category in *Seas Shipping Co. v. Sieracki,* based on the "type of work the plaintiff did [when injured] and its relationship to the ship." [37] Under *Sieracki,* the warranty of seaworthiness extends to any worker injured while "doing a seaman's work and incurring a seaman's hazards." [38] The controversy here centers not on whether Cavin fits into the category of a *"Sieracki* seaman" but on whether the category continues to exist.

The unseaworthiness remedy is the product of a complicated history, one of overlapping categories of workers, work, and recovery regimes. Congress passed the LHWCA in 1927 to replace tort damages with a no-fault workers' compensation remedy, primarily because longshore workers were excluded from state compensation remedies due to the (federal) maritime character of their work, and because the Supreme Court had struck down congressional attempts to place longshore workers under these state regimes.[39]

But in *Sieracki,* the Supreme Court held that while the LHWCA protected the longshore employer against tort actions for injuries occurring aboard vessels, it did not protect the vessel owner from unseaworthiness claims, a remedy that entails absolute liability, much like product liability.[40] *Sieracki*'s

33. *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

34. 33 U.S.C. §§ 901–950, 905 (1994 & Supp. III 1997).

35. 643 F.2d 1380, 1382 (9th Cir.1981).

36. *Blancq v. Hapag–Lloyd A.G.,* 986 F.Supp. 376, 382 (E.D.La.1997) (quoting 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 6–27, at 347 (2d ed.1994)).

37. *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

38. *Sieracki,* 328 U.S. at 99, 66 S.Ct. 872.

39. *See* Schoenbaum, § 7–1, at 372–73 (discussing *Washington v. W.C. Dawson & Co.,* 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924); *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); and *Southern Pac. Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917)).

40. *See* Martin J. Norris, *The Law of Maritime Personal Injuries* § 10:2 (4th ed.1990).

new remedy resulted in the vessel owner suing the stevedore—the employer of the workers who were loading the vessels—for indemnity, which countered the purpose of the LHWCA.[41] To alleviate this problem, Congress amended the LHWCA in 1972 to expand relief for those covered by the Act.[42] At the same time, Congress abolished the unseaworthiness cause of action and the potential for stevedore indemnity that went with it.[43]

The 1972 amendments still allow the injured longshore worker to proceed against third parties, but only for negligence—not unseaworthiness.[44] "The primary purpose of the 1972 amendment was to place the injured longshore worker 'in the same position he would be if he were injured in non-maritime employment ashore ... and not to endow him with any special maritime theory of liability or cause of action....' "[45] This purpose suggests that in cases where fault would remain uncompensated under the LHWCA—that is, in cases of non-covered land-based workers who sustain injuries while working aboard a vessel—other remedies would be available. If Congress allowed workers covered under the LHWCA to recover against vessel owners for negligence in addition to recovering benefits under the act, why

should it strand workers not covered by the act with no coverage at all, or leave them to the hazards of existing state remedies?

Courts entertaining unseaworthiness actions since 1972 have split on this question. In *Normile*, an injured federal longshore worker sued the vessel owner for unseaworthiness.[46] The Ninth Circuit affirmed the dismissal of the plaintiff's action, holding that "no longshoreman, whether publicly or privately employed, can bring an unseaworthiness action."[47] *Normile* cited the intent of the 1972 framers to abolish "other categories of unseaworthiness which have been judicially established."[48] But *Normile* did not altogether foreclose the continued existence of unseaworthiness remedies for workers in these "other categories"—workers not covered by the LHWCA.[49] And because the case dealt only with the rights of public longshore workers, who are excluded under the LHWCA[50] but have an independent federal remedy under the Federal Employees' Compensation Act (FECA),[51] it had no occasion to consider the rights of workers who would have no federal remedy other than unseaworthiness.

■ Cavin correctly notes that *Normile* has not been widely followed, even within the

41. *See Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 128–32, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Schoenbaum, § 7–10, at 434.

42. The LHWCA requires a claimant to satisfy both a situs and an occupational status test, the essence of which is to determine that the claimant is a longshore worker injured on "the navigable waters of the United States." 33 U.S.C. § 903(a) (1994).

43. *See* 33 U.S.C. § 905(b) (1994) ("In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party....").

44. *See id.*

45. Schoenbaum, § 7–10, at 435 n.8 (quoting H.R.Rep. No. 1441, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4703).

46. *See* 643 F.2d at 1381.

47. *Id.*

48. *Id.* at 1383 (quoting H.R.Rep. No. 1441, *reprinted in* 1972 U.S.C.C.A.N. 4698, 4703–04). While *Normile* finds justification for its ruling in this House Committee report, Supreme Court discussion of the 1972 amendments is sparse. A footnote of dictum in a 1996 case states, "Congress effectively overruled [*Sieracki*] in its 1972 amendments.... We have thus far declined to extend the duty further." *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 208 n. 6, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996). This cryptic observation seems ambivalent. Perhaps because the patchwork of maritime remedies does not produce a coherent whole, it is difficult to argue from one case to another.

49. *See Normile*, 643 F.2d at 1382–83 ("Given that the 1972 Amendments have eviscerated if not eliminated *Sieracki* ....").

50. *See id.* at 1382 (citing 33 U.S.C. § 903(a)(2) (1994)).

51. *See* 5 U.S.C. § 8101–8193 (1994 & Supp. IV 1998). *See also In re Boy Scouts of America*, 875 F.Supp. 1391, 1397 & n. 3 (N.D.Cal.1994), *rev'd on other grounds*, 86 F.3d 861 (9th Cir.1996).

Ninth Circuit.[52] The Fifth Circuit's case law is more supportive of the continued viability of unseaworthiness claims and, in our view, is better reasoned. In *Aparicio v. Swan Lake*,[53] federal harbor workers sued vessel owners for injuries they suffered while working aboard their vessels, alleging that the vessels were unseaworthy.[54] The court held that "if a harbor worker is not covered by the LHWCA, the *Sieracki* cause of action ... [is] still seaworthy." [55] It so held even in the face of the exclusive liability provisions of FECA, which applied to the plaintiffs.[56] By its reasoning, then, *Aparicio* is even more supportive of extending the unseaworthiness remedy to plaintiffs who lack any other federal remedy.

■ As *Aparicio* points out, the 1972 amendments state that they only apply "[i]n the event of injury to a person covered under this Act." [57] *Aparicio* further points out:

> The statute manifests no intention to expand the abolition of the *Sieracki–Ryan* construct beyond the coverage of the LHWCA. We refuse to read into it the abolition of judicially-built remedies as they apply to maritime workers not covered by the LHWCA, including not only FECA-covered employees but those amphibious workers who may be covered only by a state compensation law or who may

have no compensation law coverage at all. Had Congress intended to affect the substantive rights of persons not covered by the LHWCA, it could readily have manifested that intention.[58]

■ We find *Aparicio* persuasive in its basic point that the quid pro quo nature of the 1972 amendments, which provide a compensation regime under the LHWCA in exchange for a bar to unseaworthiness claims, counsels against their extension to those who receive no remedy under the act.[59] We adopt its holding here and conclude that, if the trial court finds no Jones Act liability on remand, Cavin's unseaworthiness claim should nonetheless proceed to trial of phase II issues to the extent that the court does not find it barred by the statute of limitations.[60]

## IV. CONCLUSION

For these reasons, we REVERSE the judgment and REMAND this case for further proceedings.[61]

---

**52.** *See, e.g., In re Boy Scouts of America,* 875 F.Supp. at 1397 & n. 3 (stating that the conclusion that *Normile* found the 1972 amendments to have abolished *Sieracki* "may overstate the Ninth Circuit's holding").

**53.** 643 F.2d 1109 (5th Cir.1981).

**54.** *See id.* at 1110.

**55.** *Id.*

**56.** *See id.* at 1118.

**57.** *Id.* at 1116 n. 10 (quoting 33 U.S.C. § 905(b) (1994)).

**58.** *Id.* at 1116.

**59.** The state claims that cases cited by Cavin that adopt *Aparicio*'s perspective, *see, e.g., In re Garda Marine, Inc.,* 1992 A.M.C. 2378, 1992 WL 315963 (S.D.Fla.1992), predate *Chandris* and have been superseded by its reasoning. But we note that the Fifth Circuit recently confirmed the vitality of *Aparicio* and extended its holding, finding no conflict with *Chandris* in doing so. *See Green v.*

*Vermilion Corp.,* 144 F.3d 332, 337–38 (5th Cir. 1998).

**60.** Cavin's brief mentions but does not brief a claim for maintenance and cure—perhaps because the "seaman" test for maintenance and cure is the same as that under the Jones Act. *See Hall v. Diamond M Co.,* 732 F.2d 1246, 1248 (5th Cir.1984). Cavin also fails to brief or mention his claim for general maritime negligence. Again, this may be because the Jones Act negligence remedy is coextensive with and preemptive of the common law negligence remedy. *See Ellenwood v. Exxon Shipping Co.,* 984 F.2d 1270, 1283 (1st Cir.1993) ("[T]he Jones Act provides the exclusive recovery in negligence for claims by seamen against their employers.").

**61.** Our ruling likewise requires us to vacate the trial court's award of prevailing-party attorney's fees and costs. But the court separately awarded the state $6,525 for additional fees it incurred in reassigning the case to new counsel due to Cavin's need for a continuance of trial. Cavin does not challenge this separate award on appeal, and our decision does not disturb it.